UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------
CHRIS PERROTTA and CARRIE CHARLESTON,
individually and on behalf of all others situated,

                                  Plaintiffs,

    -against-

JAKE DERAAFF, AUSTIN DERAAFF, DAVID SINGER,
RAVEN3 HOME BUYERS LLC, AJ3 MANAGEMENT LLC,
BELL DRIVE LLC, HUDSON VALLEY LUXURY RESORTS LLC,
and DOES 1-10,

                                Defendants.

--------------------------------------------------------------------------------

_____ cv _____

**COMPLAINT**

*JURY TRIAL
DEMANDED*

      Plaintiffs, by their undersigned counsel, allege:

**SUMMARY OF THE ACTION**

    1.     Defendants Jake and Austin Deraaff are twin brothers and self-professed "27-year-old college dropouts" who claim to own and manage over 500 residential rental properties in New York—predominately in the Hudson Valley—through a network of companies that they tout in social media accounts, paid online course materials, live seminars, and podcast recordings as generating millions of dollars in annual revenue.

    2.     In reality, the Deraaff brothers' business is a predatory, ponzi-style racketeering scheme that has followed the inevitable progression of all such frauds—now to the precipice of total collapse—posing substantial risks of both the dissipation of assets needed to compensate Defendants' victims, and the physical injury or death of residential tenants like Plaintiffs that Defendants continue to intentionally subject to unlawfully dangerous living conditions.

3.      Plaintiffs bring this action on behalf of themselves and all others similarly situated seeking damages and injunctive relief sufficient to remedy prior and ongoing injuries and prevent further misconduct in connection with the racketeering scheme Defendants have been continuously conducting since at least 2021, pursuant to: the Racketeer Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*; N.Y. Real Prop. Acts Law § 853 (prohibiting unlawful entry/detainer); N.Y. Real Prop. Law § 223-B (prohibiting retaliation by landlords); and New York common law conversion and fraud.

4.      Plaintiffs' RICO Act claims pursuant to 18 U.S.C. § 1964 are brought as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated who have been injured in their business or property by reason of Defendants' investment of racketeering income and/or conduct and/or participation of an enterprise's affairs through a pattern of racketeering in violation of 18 U.S.C. § 1961(a) and/or (c) and/or Defendants' conspiracy to do the same in violation of 18 U.S.C. § 1961(d) (the "RICO Class"), during the period of June 3, 2021 to the date of the final disposition of this action (the "RICO Class Period").

5.      Plaintiffs' claims pursuant to N.Y. Real Prop. Acts Law § 853 are brought as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated who have been put out or held out of real property by unlawful means by Defendants (the "NYRPAL Subclass"), during the period of June 3, 2024 to the date of the final disposition of this action (the "NYRPAL Subclass Period").

6.      Plaintiffs' claims pursuant to N.Y. Real Prop. Law § 223-B are brought as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated who have been unlawfully retaliated against by Defendants for reporting legal violations or

asserting their legal rights (the "NYRPL Subclass"), during the period of June 3, 2024 to the date of the final disposition of this action (the "NYRPL Subclass Period").

7.      Plaintiffs' claims of conversion pursuant to New York common law are brought as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated whose security deposits Defendants have unlawfully commingled with or otherwise treated as their own assets, in violation of N.Y. Gen. Oblig. Law § 7-103 (the "Conversion Subclass"), during the period of June 3, 2022 to the date of the final disposition of this action (the "Conversion Subclass Period").

8.      Plaintiffs' claims of fraud pursuant to New York common law are brought as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated who have been injured as a result of their reliance on intentional misrepresentations and/or omissions by Defendants (the "Fraud Subclass"), during the period of June 3, 2019 to the date of the final disposition of this action (the "Fraud Subclass Period").

## JURISDICTION AND VENUE

9.      This Court has original subject matter jurisdiction over Plaintiffs' federal claims under the RICO Act pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' pendent state law claims pursuant to 28 U.S.C. § 1367(a).

10.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1) because the Defendants all reside in this district, and pursuant to 28 U.S.C. § 1391(b)(2) because both a substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of property that is the subject of the action is situated in this district.

11.     Plaintiffs' claims are properly brought as a class action pursuant to Fed. R. Civ. P. 23(a) because: (i) the persons similarly situated to Plaintiffs are so numerous that joinder is

impractical; (ii) there are nearly identical questions of fact and law common to the class and subclasses; (iii) Plaintiffs' claims are typical of the claims of the class and subclasses; and (iv) Plaintiffs will fairly and adequately protect the interests of the class and subclasses.

## PARTIES

12.     Plaintiffs Chris Perrotta and Carrie Charleston are residents of the premises with a mailing address at 8A Bell Drive, Highland, New York, in the Town of Lloyd, in Ulster County.  Two children, ages twelve and one, also reside with them at that premises.

13.     Defendants Jake Deraaff and Austin Deraaff are twin brothers who reside in the hamlet of Garrison, New York, in the Town of Phillipstown, in Putnam County.  The Deraaff brothers jointly own, control, and operate all of the corporate defendants identified below.

14.     Defendant David Singer is a former attorney who is associated with the Deraaff Enterprise in an informal capacity as fixer/financier, but falsely purports to be an officer of Defendant AJ3 Management LLC for purposes of deceiving the Deraaff Enterprise's business counterparties.  He resides in the hamlet of Bedford Hills, in the Town of Bedford, New York, in Westchester County.

15.     Defendant Raven3 Home Buyers LLC is a New York Limited Liability Company with a principal place of business at 44 Executive Boulevard, Suite 204, Elmsford, New York, in Westchester County.

16.     Defendant AJ3 Management LLC is a New York Limited Liability Company with a principal place of business at 44 Executive Boulevard, Suite 204, Elmsford, New York, in Westchester County.

17.     Defendant Bell Drive LLC is a New York Limited Liability Company with a principal place of business at 44 Executive Boulevard, Suite 204, Elmsford, New York, in Westchester County. Bell Drive LLC is the ostensible title owner of the property located at 6-8 Bell Drive, Highland, New York, which includes the premises leased from Defendants by the named Plaintiffs.

18.     Defendant Hudson Valley Luxury Resorts LLC is a New York Limited Liability Company with a principal place of business at 303 South Broadway, Tarrytown, New York, in Westchester County.

19.     Defendants Does 1-10 are other persons employed by or associated with the other defendants who participated in the misconduct against Plaintiffs alleged herein, and whose identities are unknown by Plaintiffs, but are presumed to be either known by one or more of the named defendants, or otherwise identifiable in discovery.

## FACTS

20.     Since at least 2018, Defendants Jake and Austin Deraaff have been running a purported real estate business that is actually just a number of classic real estate rackets that the twin brothers have tied together into a single corrupt enterprise (the "Deraaff Enterprise").

21.     The Deraaff Enterprise operates by continually and brazenly spinning new webs of fraud that victimize anyone and everyone unfortunate enough to do business with any of its corporate or individual members, at every stage of the lifecycles of the properties they churn through.

22.     The Deraaff brothers openly and publicly brag about how the Deraaff Enterprise illegally solicits desperate owners of distressed, unsafe properties, and they sell

online courses teaching the pressure tactics they use—verging on, if not crossing right over into extortion—to try to force those owners to sign indentures committing to lowball, as-is, all-cash sales.

23.    Defendants then use these properties to fraudulently profiteer off of any other counterparties they can dupe into any kind of involvement with the mold-ridden firetraps that are the bread-and-butter foundation of their business.

24.    They defraud lenders they have no intention to repay, and offer security they don't have—such as the *second* first mortgage on Plaintiff's residence that they gave to a novice, unqualified investor.

25.    They stiff the contractors they are compelled to hire to fix the most egregious code violations in situations where their deliberate efforts to evade scrutiny from local governments are insufficient, and then stick unwitting buyers of those properties with mechanics' liens along with the remaining hazardous conditions they've succeeded in concealing.

26.    Most dangerously, they lure unsuspecting renters, like Plaintiffs, into giving deposits—that Defendants steal—to fraudulently secure residential leases to these dangerous properties, and then they try to squeeze rent from their imperiled tenants while engaging in blatantly illegal campaigns of intimidation and retaliation, including unlawful actual and constructive evictions.

27.    Even if Defendants only owned and fraudulently misused the single property in which Plaintiffs reside, they would pose a risk to the community.  But according to the Deraaff brothers, the Deraaff Enterprise owns more than 500 residential rental units, the vast majority of which are located in the Hudson Valley.  And the Deraaff brothers are supposedly

"managing" all of those properties, properly safeguarding security deposits and accounting for rent, and taking all measures necessary for the health and safety of all those tenants—*by themselves.*

28.    Defendants do not employ any maintenance staff, brokers, accountants, controllers, attorneys, or any of the other professionals that are necessary, from any practical perspective, to safely and legally manage a residential rental property business of even half the size they routinely claim in their online marketing materials.

29.    Instead, the Deraaf brothers personally shake down tenants for rent, personally threaten them with illegal eviction, or with the sale of their residences to "even worse" landlords.

30.    They personally co-mingle, and thereby convert to their own use, all of their tenants' security deposits, which they dissipate through multiple non-business bank accounts belonging to family members, girlfriends, and other associates, all of which they routinely use to conduct the business of their corrupt enterprise, instead of utilizing an appropriate corporate accounting function managing exclusively corporate-owned bank accounts and safeguarding client funds in segregated trust accounts.

31.    And they personally triage their grudging and inadequate responses to the most critical, health and safety related threats to their tenants; personally burn through relationships with a series of contractors they routinely fail to pay on time, or at all, to make the bare minimum repairs they think they can get away with; and personally appear in local courts to lie to municipal judges at building violation hearings about their business's capability and intention to keep their tenants safe.

32.     Of course, the Deraaf brothers know that nobody would trust a pair of 27-year old, self-described college dropouts to manage the hundreds of dilapidated residences they bought on "as-is" terms in this manner, and so they have spent years carefully cultivating a very different, completely fictitious image of themselves through a deceptive online marketing campaign.

33.     In this fantasy world, the Deraaf brothers are self-made multimillionaires who have time to share their wisdom with real-estate industry podcasters.  They claim the expertise to create and sell online courses teaching newcomers to the industry how to follow their secret road to riches.  And they bait vulnerable individuals with frequent advertisements for in-person seminars purporting to explain how "anyone" can learn to buy and sell properties like them, with "no money down," before they switch to solicitations for cash or credit for "special" investments they offer to let their marks "in on" as a favor.

34.     And, to complete their real-estate-mogul costumes, the Deraaff brothers created a phony short-term luxury rental property business, Defendant Hudson Valley Luxury Resorts, LLC, to hold and purportedly operate a small portfolio of large residences with amenities like swimming pools.

35.     In reality, these properties are as heavily and fraudulently leveraged as their dozens of mobile homes, and Defendants do not have the liquidity or staff to actually maintain and manage them profitably as short-term luxury rentals. Instead, Defendants use the properties themselves for personal purposes, to offer to counterparties for their use in lieu of the cash they don't have to meet their obligations, and to provide deceptive backdrops for the stylized photographs they use to present themselves as players in the high-end realty market.

36.     But now, all the lies are catching up to the Deraaff brothers and their corrupt racketeering enterprise.  Over the past year, a cascade of lawsuits and judgments has left Defendants unable to obtain financing even within the extremely marginal and relationship-based sub-prime market that fueled most of their acquisitions.  This, combined with their pervasive theft and dissipation of both corporate and tenant trust funds, has resulted in a liquidity crisis for Defendants, who now need to beg, borrow, and steal every dollar they need to pay out just to keep their operation going.

37.     Six months ago, in December 2024, Defendants' liquidity crisis drove them to defraud a novice real-estate investor into giving them $25,000 in exchange for a first mortgage on a dilapidated, unsafe two-family residence built in the nineteenth century that is located at 6-8 Bell Drive, Highland, New York.  This property, which includes Plaintiffs' residence, is nominally owned by Defendant Bell Drive LLC, but that entity, like all of the others they establish to hold title for their properties, is merely an instrument and *alter ego* of the Deraaff Enterprise and its wanna-be kingpins Defendants Jake and Austin Deraaff.

38.     Defendants gave this first mortgage on the 6-8 Bell Drive property, which was subsequently recorded, despite the fact that they had *already given a recorded first mortgage against the property* securing a much larger loan, which was itself supposedly required to be used to repair the property so that it could meet local building code requirements for occupancy.

39.     In reality, Defendants simply stole most or all of those loan proceeds to meet their immediate spending needs (or wants), and have only put into the property the much smaller sums that they were legally compelled to by the local building department in order to

eventually cure the most dangerous of the many code violations that existed when they bought the building.

40.    Unfortunately for them, it was into this particular corner of the Deraaff Enterprise's web of deceit that Plaintiffs unwittingly walked in December 2024, just as Defendants' desperation was rising to its current fever pitch.

41.    Consistent with their established pattern, Defendants lied to Plaintiffs about the property and their prospective role as Plaintiffs landlords, most fundamentally, by falsely representing that the premises was legally available to be rented, and that permits had been obtained and contractors retained to perform certain obviously-outstanding repairs.

42.    Defendants also lied to Plaintiffs in the written lease agreement they induced Plaintiffs to sign, not just within their representations as to the condition of the property itself, but also as to the security deposit they promised to hold in an identified escrow account, which they instead and at all times intended to simply steal and convert to their own use to help alleviate their escalating liquidity crisis.

43.    Once Plaintiffs had taken the bait, and they (and their two minor children) had moved into the residence, their long and still-ongoing nightmare began.

44.    Plaintiffs soon discovered that the home they thought they had rented was a death trap that lacked operable radiators, was riddled with dangerous structural defects, and was dependent on an electrical system that seemed not to have been professionally updated virtually since the building had been built in 1880.

45.    When Plaintiffs complained to Defendants, and eventually notified the local building inspector, Defendants responded with their still-continuing campaign of illegal threats and retaliation.

46.     When Plaintiffs were constructively evicted from the premises for more than a week in January 2025 as a result of the building department tagging the premises as unsafe for occupancy, Defendants responded not by compensating Plaintiffs for the alternate accommodations they were forced to pay for, but by attacking Plaintiffs for involving the authorities and demanding that pay rent to Defendants for tenancy in a legally uninhabitable building.

47.     But things did not get better after Defendants eventually paid to have the electrical system repaired and Plaintiffs were able to re-occupy the residence, if anything, they got worse.  Despite the continuation of conditions violating the warranty of habitability such as broken and inoperable exterior windows, Defendants refused to make timely repairs, and instead engaged in a campaign of threats and intimidation aimed at forcing Plaintiffs into either paying undiscounted rent or vacating the property.

48.     Even after Plaintiffs retained counsel to represent them, the Deraaff brothers refused to engage their own attorneys to communicate regarding Plaintiffs tenancy, and instead continued to relentlessly harass Plaintiffs with phone calls and text messages demanding money, and continued to make unwanted, intimidating in-person appearances at the property despite repeatedly being asked to leave Plaintiffs in quiet enjoyment of the premises.

49.     In early February 2025, in a particularly nightmarish twist, Defendants told Plaintiffs that they intended to try to sell the building to new owners, and alternately tried to bribe and intimidate Plaintiffs into assisting them in deceiving any prospective buyers as to the condition of the property.

50.    Specifically, Defendants offered Plaintiffs a $5,000 cash bounty in exchange for their cooperation with this deception and an agreement to vacate if desired by the buyer. But in the same text message, Defendants threatened Plaintiffs that if they didn't play ball, Defendants would sell the property to a member of one of the Hasidic communities concentrated in nearby counties in New York and New Jersey, stating explicitly that "we will sell to the hasidics and if you think we are bad landlords just wait."

51.    After their scheme to quickly flip Plaintiffs' residence failed, Defendants began making routine and overt threats to evict Plaintiffs for nonpayment, despite still owing Plaintiffs compensation relating to their prior illegal constructive eviction, and despite their failure to timely complete repairs required by the local building department to cure safety code violations.

52.    In response, undersigned Plaintiffs' counsel repeatedly told the Deraaff brothers in phone calls and by text message to stop communicating with Plaintiffs or their counsel concerning the tenancy, and to instead exclusively have their attorney communicate with undersigned counsel concerning Plaintiffs' tenancy.

53.    At first, Defendant Jake Deraaff told Plaintiffs' counsel that Defendants did not have an attorney, and that he (Jake Deraaff) represented Defendants' business interests himself for legal purposes. Later, after making more illegal eviction threats, Defendant Jake Deraaff told Plaintiffs' counsel that he would have his "eviction lawyer" call Plaintiffs' counsel.

54.    Plaintiffs' counsel was then contacted by telephone and text message by Defendant David Singer, who at first purported to be in-house counsel to Defendants' real estate business. However, in those initial contacts, Defendant Singer did not behave like a

licensed, practicing attorney, and instead acted like a business confederate of Defendants, seeking to use his purported legal knowledge and experience to pressure Plaintiffs into agreeing to the Deraaffs' prior efforts to enlist Plaintiffs in deceiving prospective buyers of the property.

55.    Upon consulting publicly-available records, Plaintiff's counsel discovered that although Defendant Singer had at one time been an attorney admitted and registered to practice in New York, he had allowed his registration to lapse, and had in fact not practiced law in many years.

56.    When Plaintiffs' counsel confronted Defendant Singer regarding the incompatibility of his purported role as counsel to Defendants' real estate business and his failure to register as an attorney, Defendant Singer suddenly disclaimed any role as in-house counsel, and stated that he was actually the "president" of Defendants' real-estate business. But when Plaintiffs' counsel asked what entity Defendant Singer was the president of, he at first could not provide an answer, and instead claimed that he was president "of all of them, of the whole business."

57.    When Plaintiffs' counsel expressed skepticism, explaining that Defendant Singer's name and purported title did not appear on any of the many corporate filings made and contracts entered into by the Defendants' corporate entities, Defendant Singer eventually settled on claiming that he was the president of Defendant AJ3 Management LLC.

58.    Over the course of the next few weeks, Defendant Singer attempted to get Plaintiffs' counsel to agree to persuade Plaintiffs to cooperate with Defendants' fraudulent attempts to pass the property off on an unsuspecting buyer, in exchange for a one-time lump sum payment to Plaintiffs of as much as $10,000.

59.    Defendant Singer specifically expressed his confidence that Plaintiffs' counsel's entitlement to a standard contingency fee on such a payment should provide more than reasonable incentive for Plaintiffs' counsel to promote the offered deal to Plaintiffs.

60.    When Plaintiffs failed to respond affirmatively to Defendants' offer, they resumed their campaign of harassment and abuse, continually demanding rent payments and threatening eviction in unwanted phone calls, texts, and in-person confrontations at Plaintiffs' home, while refusing to make the still, to this date, incomplete repairs to safety code violations at the property, including broken and inoperable exterior windows.

61.    Most recently, and concerningly, Defendant Jake Deraaff challenged Plaintiff Chris Perrotta to a fistfight during a phone call ostensibly concerning the still-incomplete repairs to the premises, subsequently demanded that Plaintiffs fire their undersigned counsel, and threatened that if Plaintiffs did not do so, Defendants would unlawfully institute formal eviction proceedings against Plaintiffs.

62.    Defendants' demands that Plaintiffs fire undersigned counsel were prompted at least in part by Defendants' discovery that undersigned counsel undertook his representation of Plaintiffs *pro bono*.  As noted above, Defendant Singer explicitly dangled the potential of a contingency payment as inducement for undersigned counsel to persuade Plaintiffs to collaborate in Defendants' scheme to palm off their defective property on unsuspecting buyers.

63.    Subsequently, Defendant Jake Deraaff told the Town of Lloyd Justice Court that undersigned counsel was in words or substance a "bloodsucker," whose concerns regarding the safety of Plaintiffs' family could be discounted due to presumed financial

interest in the matter.  Undersigned counsel responded immediately in open court by stating that his engagement on Plaintiffs' behalf was *pro bono.*

64.    Immediately thereafter, the Town Justice asked Defendant Jake Deraaff if he had ever seen what the bodies of children burned in house fires looked like, and directed him to complete the (still incomplete) repairs to Plaintiffs' residence.

65.    And after undersigned counsel related his contacts with Defendant Singer, and his concern that there were no responsible adults in charge of Defendants' claimed empire of residential rental units in New York, the Town Justice also advised Defendant Jake Deraaff to retain an admitted, practicing attorney to represent Defendants' business.  Defendants have ignored that sage advice.

## SUMMARY OF FACTS RELEVANT TO RICO CLAIMS

66.    This action is brought, in part, under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., based on a pattern of racketeering activity involving multiple defendants acting in concert through the Deraaff Enterprise for the common purpose of defrauding the enterprise's counterparties at every level and stage of  the residential real estate business.

67.    The Deraaff Enterprise alleged herein consists of an association-in-fact enterprise made up of the named defendants—each of whom is a RICO person within the meaning of relevant authorities—in addition to other individuals and corporate entities known and unknown who are members of that enterprise but not named as defendants herein..

68.    The Deraaff Enterprise engaged in interstate commerce, including by transmitting communications to its potential and actual counterparties in the residential real

estate business across state lines using U.S. Mail, email, wire transfers, and digital platforms. These communications constitute acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and were made routinely and repeatedly, on a daily or near-daily basis, between at least 2021 and the preseFurther nt, including but not limited to: misrepresentations about Defendant's ability and intention to honor their contractual and other legal obligations to their counterparties, including property sellers and buyers, lenders, contractors, and tenants.

69.    In addition to the foregoing, the Defendants' conduct also constitutes ongoing acts of interstate transportation of stolen property in violation of 18 U.S.C. § 2314, in that Defendants routinely and regularly, on at least a monthly basis, caused the transmittal of stolen tenant security deposits through interstate wires or other instruments of interstate commerce from ostensible tenant trust/escrow accounts to personal and corporate accounts Defendants owned, controlled, or used.

70.    In addition to the foregoing, the Defendants' conduct also constitutes ongoing acts of money laundering in violation of 18 U.S.C. § 1956 and § 1957. Specifically, the Deraaff Enterprise's members routinely and regularly engaged, on a daily or near-daily basis, in financial transactions using the proceeds of racketeering activity—namely, funds obtained through wire fraud, mail fraud, and the transportation of stolen property in interstate commerce. These proceeds were knowingly funneled from the Deraaff Enterprise's business counterparties through a series of non-business accounts belonging to the individual defendants, their families, girlfriends, and other associates, and used to fund salaries and other payouts to the individual members, consultant payments, legal fees, and other disbursements designed to enrich individual enterprise members or entities under their control.

71.     Each instance in which Defendants directed or authorized such a transaction, while knowing of the unlawful origin of the funds, constitutes a separate predicate act of money laundering. These acts furthered the concealment and perpetuation of the enterprise's underlying frauds, and demonstrate an ongoing pattern of illicit financial management integral to the RICO enterprise's operations.

72.     The pattern of racketeering activity is continuous and ongoing. It includes not only the historical acts of fraud, theft, and money laundering, but also continued concealment of material facts from counterparties and government officials, continued use of misappropriated assets for the Deraaff Enterprise's ongoing operations, and continued pursuit of additional funds from new victims to feed the bottomless financial hole its business model naturally creates. The acts are related and interdependent, reflecting a shared scheme by the enterprise members to obtain money or control by fraudulent means, and to prevent Plaintiffs, other class members, or government authorities from detecting and interfering with that scheme.

73.     These acts are not isolated. They are part of a coordinated and deliberate course of conduct spanning multiple years and jurisdictions. The predicate acts began no later than 2021 and are continuing into 2025, involving ongoing attempts to secure funding from sources in multiple states besides New York, including at least both New Jersey and Connecticut.

**SUMMARY OF FACTS REGARDING THE
CONTINUING DANGER POSED BY DEFENDANTS' MISCONDUCT**

74.     Defendants are a menace, not only to Plaintiffs, but to the broader Hudson Valley community they prey on.  They will not comply with their legal obligations as residential landlords, and their repeated, broken promises to the contrary cannot be relied on.

75.    Sooner or later, unless the corrupt Deraaff Enterprise is terminated by the Court, and they are barred from engaging in similar businesses in the future, Defendants will do more than just lie, cheat, and steal.  Inevitably, the Deraaff brothers' reckless, incompetent, and predatory management of hundreds of rental residences is going to end up seriously injuring or even killing one or more of their tenants.

76.    Plaintiffs therefore bring this action not only to be made whole and to gain the Court's protection for themselves, but to try to protect the entire class of Defendants' past, current, and future victims, and to prevent the occurrence of the kind of tragedy that Defendants' blithely impose the risk of every day their fraud scheme continues.

## FIRST CAUSE OF ACTION

### Investment of Racketeering Income
### 18 U.S.C. § 1961(a)

77.     Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

78.     Beginning in or around 2019 and continuing through the present, Defendants knowingly received income derived, directly or indirectly, from a pattern of racketeering activity as defined in 18 U.S.C. §§ 1961(1) and 1961(5), including but not limited to acts of wire fraud and mail fraud (18 U.S.C. §§ 1343 and 1341), interstate transportation of stolen property (18 U.S.C. § 2314), and money laundering (18 U.S.C. §§ 1956 and 1957).

79.     Defendants then used or invested, directly or indirectly, part or all of such income, or the proceeds of such income, in the operation of the Deraaff Enterprise and its expansion into new locations and the establishment of new corporate entities, or in one or more other enterprises engaged in or affecting interstate commerce.

80.     At all relevant times, an enterprise existed within the meaning of 18 U.S.C. § 1961(4), affecting interstate commerce.  Specifically, the Defendants formed an association-in-fact enterprise, composed of a group of individuals and entities associated in fact, with a common purpose of defrauding the enterprise's counterparties at every level and stage of the residential real estate business.

81.     As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(a), Plaintiffs have suffered injury to their business and property.

82.     Plaintiffs are therefore entitled to treble damages and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

.

## SECOND CAUSE OF ACTION
### Conducting/Participating in Management of Enterprise
### Through a Pattern of Racketeering Acts
### 18 U.S.C. § 1961(c)

83.    Plaintiffs reallege and incorporate by reference each and every allegation in the

paragraphs above as if the same were fully set forth herein.

84.    At all relevant times, an enterprise existed within the meaning of 18 U.S.C. §

1961(4), affecting interstate commerce.  Specifically, the Defendants formed an

association-in-fact enterprise, composed of a group of individuals and entities associated in fact,

with a common purpose of defrauding the enterprise's counterparties at every level and stage of

the residential real estate business.

85.    The enterprise had a common purpose of unjustly enriching Defendants at the

expense of the business counterparties they defraud in connection with their predatory real

estate business.

86.    Each Defendant was employed by or associated with the enterprise and

conducted or participated, directly or indirectly, in the conduct of its affairs through a pattern of

racketeering activity, as defined in 18 U.S.C. § 1961(1) and (5).

87.    This pattern included multiple related predicate acts, including but not limited to

acts of wire fraud and mail fraud (18 U.S.C. §§ 1343 and 1341), interstate transportation of

stolen property (18 U.S.C. § 2314), and money laundering (18 U.S.C. §§ 1956 and 1957).

88.    These acts were related, continuous, and constituted an ongoing threat of

continued criminal activity.

89.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c),

Plaintiffs have suffered injury to their business and property.

90.     Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## THIRD CAUSE OF ACTION
### Conspiracy to Violate 18 U.S.C. § 1961(a) and/or (c)

91.     Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

92.     Beginning in or around 2019 and continuing through the present, Defendants knowingly and willfully conspired to violate 18 U.S.C. § 1962(a) and/or 18 U.S.C. § 1962(c).

93.     Each Defendant agreed to the overall objective of the conspiracy, namely, unjustly enriching Defendants at the expense of the business counterparties they defraud in connection with their predatory real estate business.

94.     Each Defendant knowingly committed or agreed to facilitate one or more overt acts in furtherance of the conspiracy

95.     Each Defendant is jointly and severally liable for the acts of all other conspirators, including acts not specifically attributed to them individually but undertaken in furtherance of the conspiracy.

96.     As a direct and proximate result of Defendants' conspiracy to violate the RICO statute, Plaintiffs have suffered injury to their business and property.

97.     Plaintiffs are entitled to treble damages, costs, and attorneys' fees under 18 U.S.C. § 1964(c).

**FOURTH CAUSE OF ACTION**
**Unlawful Entry/Detainer in Violation of N.Y. Real Prop. Acts Law § 853**

98.    Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

99.    On multiple occasions between January 2025 and the present, Defendants have unlawfully constructively evicted, and unlawfully threatened to actually evict Plaintiffs from their residence.

100.    As a direct and proximate result of Defendants' unlawful constructive eviction and threats of actual eviction, Plaintiffs have been damaged.

101.    Plaintiffs are therefore entitled to treble damages, costs, and attorneys' fees pursuant to N.Y. Real Prop. Acts Law § 853.

**FIFTH CAUSE OF ACTION**
**Prohibited Retaliation in Violation of N.Y. Real Prop. Law  § 223-B**

102.    Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

103.    Since the outset of their tenancy in Defendants' property, Plaintiffs have attempted in good faith to communicate complaints to Defendants and to relevant local authorities concerning health and safety violations at the premises, and to enforce their rights under their lease agreement with Defendants.

104.    In retaliation for Plaintiffs' aforementioned good faith efforts, Defendants have continually and repeatedly altered the terms of the tenancy, in that they have refused to allow Plaintiffs quiet enjoyment of premises meeting the warranty of habitability, have constructively evicted Plaintiffs through their failure to maintain safe living conditions, and have unlawfully threatened to commence formal eviction proceedings against Plaintiffs.

105.    As a direct and proximate result of Defendants' unlawful retaliation, Plaintiffs have been damaged.

106.    Plaintiffs are therefore entitled to damages, costs, and attorneys' fees pursuant to N.Y. Real Prop. Law § 223-B.

## SIXTH CAUSE OF ACTION
### Conversion

107.    Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

108.    Plaintiffs gave Defendants a security deposit that Defendants promised to hold in trust for Plaintiffs in a specific escrow account identified in their written lease.

109.    Defendants have never had any legal entitlement to possession or use of Plaintiffs' security deposit.

110.    Despite lacking any legal entitlement to Plaintiffs' security deposit, Defendants caused those funds to be removed from the identified escrow account, co-mingled with Defendants own funds, and thereby converted to Defendants' own use.

111.    As a direct and proximate result of Defendants' unlawful conversion of their security deposit, Plaintiffs have been damaged.

112.    Plaintiffs are therefore entitled to damages, costs, and attorneys' fees.

## SEVENTH CAUSE OF ACTION
### Fraud

113.    Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

114.    Defendants made numerous representations, in the written lease agreement and in oral and written communications to Plaintiffs thereafter, regarding the safety of the premises

and Defendants' intention and capability to safeguard both Plaintiffs' tenancy and their security deposit.

115.    Defendants' representations regarding the safety of the property and their intention and capability to meet their legal obligations were all materially false and misleading.

116.    Plaintiffs relied on Defendants' false and misleading representations.

117.    As a result of their reliance on Defendants' false and misleading representations, Plaintiffs have suffered damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that a judgment and order be entered awarding the following relief, with whatever post-trial modifications the Court may determine are necessary to avoid duplicative recoveries:

1. An award of compensatory damages against Defendants, jointly and severally,          , in an amount to be determined at trial, but reasonably believed to be no less than $25,000;

2. An award of punitive damages against Defendants, jointly and severally, in an amount to be determined at trial, but no less than triple the compensatory damages awarded pursuant to each of Plaintiffs' first four causes of action;

3. An award of Plaintiff's reasonable costs and disbursements in asserting this cause of action;

4. A permanent receiver to assume control of Defendants' real-estate business and to wind down its operations through an orderly liquidation of its properties;

5. A permanent injunction compelling the dissolution of the corporate Defendants and prohibiting the individual defendants from engaging in any business related to the rental of residential real estate anywhere within the State of New York; and

6. Such other and further relief as the Court deems just and proper.


New Paltz, New York
June 3, 2025

`

                                        Respectfully submitted,

                                        LAW OFFICE OF JOHN OLESKE

                                        by: _____/s_____
                                              John Oleske
                                        243 Main Street, Suite 50
                                        New Paltz, NY 12561
                                        (646) 709-7538
                                        john@johnoleskelaw.com
                                        *Attorney for Plaintiffs*